This medical malpractice case was filed on May 4, 1981, by Vicki Diane Peden, daughter of Delena Jackson Aderholt and administratrix of her estate. Ms. Peden claimed that the death of Mrs. Aderholt at age 43 was proximately caused by the negligence of Dr. James D. Ashmore during her admission and treatment at Humana Shoals Hospital in Sheffield, Alabama, on May 13, 1980. Two drug manufacturers were also named as parties defendant; however the trial court granted their motions for summary judgment, and no appeal has been taken as to those defendants.
A jury trial was commenced on December 11, 1988. Ms. Peden rested her case three days later, and Dr. Ashmore filed a motion for a directed verdict. The motion was based upon the defendant's contention that his actions in the care and treatment of Mrs. Aderholt were not negligent and were not the proximate cause of her death. After hearing arguments from counsel, the trial judge granted the motion. Ms. Peden's motion for a new trial was denied by the trial court on January 13, 1989. She appeals.
The testimony reflects that Mrs. Aderholt was admitted to Humana Shoals Hospital on May 13, 1980. Her sister, Beatrice Grissom, testified that when Mrs. Aderholt got to the hospital she was vomiting and complaining of a headache. According to Mrs. Grissom, Mrs. Aderholt did not carry on a conversation: "[S]he was just too sick, you know, she would answer questions."
Dr. Ashmore testified that Mrs. Aderholt had been his patient for a number of years. Mrs. Aderholt had visited his office some 36 times. His records reflect that he had seen her himself in his office 23 times and that he had admitted her to the hospital 5 times. He first saw her as a patient on January 28, 1976, when her complaint was fever, nausea, vomiting, and headache. He then saw her in February 1976, when her complaints were nausea, vomiting for two days, headache, dizziness, and a complaint that the pupil in her left eye was larger than the pupil in the right eye. Dr. Ashmore explained the enlargement of the pupil *Page 1012 
as being what is called Horner's syndrome, with a migraine headache.
In 1975, before Mrs. Aderholt became Dr. Ashmore's patient, she had undergone open-heart surgery to replace a heart valve. Because of this surgery, she was taking the anti-coagulant drug Coumadin. In 1976, she took an overdose of 24 tablets of Coumadin and had blood in her nose and mouth, which was caused by the overdose, as well as high blood pressure. When Dr. Ashmore was asked whether he and Mrs. Aderholt had had numerous conversations about Coumadin, he replied, "Yes, sir, she knew more about the possible dangers of Coumadin than any patient I had ever known." He testified that he had warned her not to take more than one-and-a-half milligrams per day. Dr. Ashmore further testified that Mrs. Aderholt had been seeing a psychiatrist off and on since 1970. After the overdose, he referred her back to Dr. Glaister, her psychiatrist. In July 1976, July 1977, and October, November, and December 1977, Mrs. Aderholt visited Dr. Ashmore's office complaining of headaches and vomiting. Again in February 1980, she came to him with complaints of headaches, dizziness, and vomiting.
The record reveals that, when Mrs. Aderholt was admitted to the hospital, she was taking a number of medications. First, as previously discussed, she was taking Coumadin. Next, she was taking ferrosulfate for her blood, necessitated by the fact that her replacement valve was made of metal and plastic, so she was slightly anemic all the time. She was also taking Tofranil, a tricyclic antidepressant or mood elevator, and Mellaril, another antidepressant or mood elevator, prescribed for her by her psychiatrist, Dr. Glaister. In addition, she took Pavabid, a drug that dilates blood vessels and improves circulation, to alleviate bad circulation in her legs, hands, and neck. Mrs. Aderholt also smoked two packs of cigarettes a day.
Dr. Ashmore testified that he was contacted by Nurse Bange at approximately 10:52 a.m. on the day Mrs. Aderholt came to the hospital. Due to Mrs. Aderholt's medical history and symptoms, Dr. Ashmore ordered that she be given an injection of 50 milligrams of Shogan. He sent his physician's assistant, Ned Unger, to the hospital specifically to see Mrs. Aderholt. Unger reported to Dr. Ashmore that Mrs. Aderholt had a severe headache, was experiencing nausea and was vomiting, and that she had a dilated pupil that was fixed on the right side. Dr. Ashmore ordered that the staff do a prothrombin test and a hemocrit and hemoglobin test; give her 10 milligrams of Vitamin K intravenously and 5 milligrams of Valium intravenously; and do a brain scan "stat" (i.e., immediately). He testified that the Vitamin K was to try to neutralize the effect of Coumadin on the thrombin in her blood.
Dr. Ashmore testified that when Ned Unger called him from the hospital, he had two diagnoses on Mrs. Aderholt:
 "At two o'clock when he called me, I had two working diagnoses on her; she could either have a migraine headache with a dilated pupil, which she had had six times in the office over the last four years, or with her being cold, clammy and lethargic, I felt like she might have a hemorrhage behind her right eye in the brain." [T. 71.]
The brain scan was completed at 5:00 p.m., and it confirmed his suspicion that Mrs. Aderholt had an expanding intracranial lesion secondary to a prolonged prothrombin time. Dr. Ashmore telephoned Dr. John Nofzinger, a neurosurgeon, from the X-ray room and arranged for the patient to be transferred to his care at Eliza Coffee Memorial Hospital in Florence, Alabama. Mrs. Aderholt died shortly after being transferred to Florence.
The question before us is whether the trial court erred in directing a verdict for the defendant. We have previously stated the law as to the granting of a directed verdict in a medical malpractice case as follows:
 "A directed verdict is proper where there is a complete absence of pleading or proof on an issue or issues material to a cause of action. Shellnut v. Randolph County Hospital, 469 So.2d 632
(Ala.Civ.App. 1985). . . . When a directed verdict *Page 1013 
motion is made, the evidence should be viewed in the light most favorable to the opposing party, and if a reasonable inference can be drawn against the moving party, then the trial court should deny the motion. Turner v. People's Bank of Pell City, 378 So.2d 706 (Ala. 1979)."
Dobbs v. Smith, 514 So.2d 871, 872 (Ala. 1987).
In Alabama, a medical malpractice plaintiff must establish through expert testimony that the defendant/physician breached the standard of care imposed upon him by Alabama Code 1975, § 6-5-484, and that this breach was the proximate cause of the injury or death:
 "Section 6-5-484, Code of Alabama (1975), as we have construed it, imposes a legal duty upon doctors to exercise the degree of reasonable care, diligence, and skill that reasonably competent physicians in the national medical community would ordinarily exercise when acting in the same or similar circumstances. Keebler v. Winfield Carraway Hospital, 531 So.2d 841 (Ala. 1988). To recover damages for an alleged breach of this duty, a plaintiff must produce evidence that establishes 1) the appropriate standard of care, Keebler, supra; Dobbs v. Smith, 514 So.2d 871 (Ala. 1987), 2) the doctor's deviation from that standard, Keebler; Dobbs, and 3) a proximate causal connection between the doctor's act or omission constituting the breach and the injury sustained by the plaintiff. Ensor v. Wilson, 519 So.2d 1244 (Ala. 1987); Howard v. Mitchell, 492 So.2d 1018 (Ala. 1986)."
Bradford v. McGee, 534 So.2d 1076, 1079 (Ala. 1988).
The plaintiff must adduce some evidence that the alleged negligence probably caused the injury or death:
 "In a medical malpractice case, in order to find liability there must be more than a mere possibility that the alleged negligence caused the injury. Williams v. Bhoopathi, 474 So.2d 690, 691
(Ala. 1985). There must be some evidence that that negligence probably caused the injury. Orange v. Shannon, 284 Ala. 202, 206, 224 So.2d 236, 239
(1969)."
Howard v. Mitchell, 492 So.2d 1018, 1019 (Ala. 1986).
In reviewing the record in this case, we must determine whether the expert testimony presented by Ms. Peden established that Dr. Ashmore breached the standard of care, and, if so, whether this breach proximately caused the death of Mrs. Aderholt.
Ms. Peden presented the expert testimony of Dr. Ali Shakir of Oklahoma City, Oklahoma, in a videotape deposition. Dr. Shakir's testimony found fault with the delay in giving Mrs. Aderholt treatment. However, Dr. Shakir could not say with any degree of certainty what the outcome would have been if the alleged "proper" treatment had been rendered:
 "Q. I see, and in — I think I was getting around to asking you if — is there any way that we now can sit back and say with any degree of certainty what would have been the outcome if proper treatment had been rendered?
 "A. It would be speculation at this point to say what the outcome would have been, but it is fair to say she would have had a far better chance to survive or live a normal life or live with a stroke, or she could have still died, but the fact she did not get the treatment or care for so many hours made the possibility of brain damage and death and the negative parts of the speculation more strong." [T. 193.]
Dr. Shakir's testimony failed to establish a causal connection between Dr. Ashmore's treatment and Mrs. Aderholt's death:
 "Q. Is it your opinion that had [Mrs. Aderholt] gotten the care and treatment which you say she should have, that she would have lived?
 "A. Life and death are never guaranteed in any medical specialty, unfortunately. But based upon literature, deductions are made as to what is appropriate care and what is a percentage mortality. I would say that her mortality and her morbidity *Page 1014 
statistics would have shifted in her favor if she got the care I recommended. That doesn't mean she would have been a normal person back in Dr. Ashmore's office. She could have still died, she might have had a stroke; it is all speculative and I cannot get into that." [T. 216-17.]
Dr. Shakir's testimony reveals that his criticism was only regarding the fact that, in his opinion, Mrs. Aderholt's diagnostic and treatment care was delayed. Upon being given a hypothetical question concerning the treatment that was administered, he could not say that the outcome would have been different with other treatment:
 "Q. Dr. Shakir, if you will, assume for us that [Mrs. Aderholt] developed some intracranial bleeding between 5 and 24 hours before she was admitted to Shoals Hospital, and that when she arrived at Shoals Hospital, she was lethargic; she had a history of vomiting old blood at home that morning, and had vomited some old blood after getting into the emergency room. Assume that her pro time was taken immediately upon receipt at the hospital, and it measured 45.5 seconds with a control of 12.0 seconds. And assume that Vitamin K, in appropriate dosage, was started immediately upon the prothrombin time being made known to the doctors; and assume that as closely in time as possible a nuclear brain scan as that done at Shoals Hospital was performed and revealed what is reflected in Exhibit Number 2 from the brain scan, do you have an opinion as to whether or not there was anything that could have been done at that time that would have saved [Mrs. Aderholt's] life. Go ahead.
 "A. Hypothesizing on that assumption, I cannot say whether she would have lived or died. She could have died during surgery; she could have died waiting for surgery. My criticism has only been that her care was — her diagnostic and treatment care was delayed. I have no means to say at this point that if everything was done appropriate from the emergency room that she would have lived or not suffered brain damage.
 "Q. Let me make sure I understand you. What you are telling us today, and what you expect to tell a jury in Alabama is that you criticize what was done or not done, as the case may be, for [Mrs. Aderholt], but you are not and cannot state that even if what you say should have been done had been done, the outcome would have been any different?
"A. Right." [R-258-59.]
Dr. Nofzinger, the neurosurgeon to whose care Mrs. Aderholt was transferred by Dr. Ashmore, testified that he doubted that there was anything that could have been done to save Mrs. Aderholt's life. He responded to a question from Dr. Ashmore's attorney as follows:
 "Q. And after reviewing the records in this case — the nurses' notes, the discharge summary from the Shoals Hospital, the discharge summary from the Eliza Coffee Hospital and various records that you have been provided here today, in your opinion, is there anything that could have been done to save this lady's life?
 "A. Based on what has been said here, the questions that have been asked here, what I know of the case from the records we have gone through, I doubt it." [T. 323.]
After a careful review of the record, we are of the opinion that the plaintiff did not present a scintilla of evidence that there was negligence by Dr. Ashmore that proximately caused the death of Mrs. Aderholt.[1] *Page 1015 
We therefore affirm the judgment of the trial court.
AFFIRMED.
HORNSBY, C.J., and ALMON, ADAMS, HOUSTON and KENNEDY, JJ., concur.
[1] This action was pending in the courts of this state on June 11, 1987; therefore, Code 1975, § 12-21-12, does not apply, and the standard of review is the "scintilla rule" of evidence.