585 So.2d 1325 (1991)
Calvin V. SMITH, as father of Victor Scott Smith
v.
MEDICAL CENTER EAST, et al.
89-1490.
Supreme Court of Alabama.
August 16, 1991.
*1326 E. Ray Large, Birmingham, for Calvin V. Smith.
Lyman H. Harris and Linda E. Winkler, Birmingham, for appellee Medical Center East.
Michael A. Florie, Walter W. Bates, Ann Sybil Vogtle and W. Stancil Starnes, Birmingham, for appellee Cardio-Thoracic Surgeons, P.C.
Thomas W. Christian and Robert E. Cooper of Rives & Peterson, Birmingham, for appellee Southeastern Emergency Physicians, P.A.
Crawford S. McGivaren, Jr. and Sara E. Akin, Birmingham, for appellee Carraway Methodist Medical Center.
KENNEDY, Justice.
Calvin V. Smith, as the father of Victor Scott Smith, deceased, filed a wrongful death action against Medical Center East; Carraway Methodist Medical Center; Southeastern Emergency Physicians, P.A.; Cardio-Thoracic Surgeons, P.C; Suburban Ambulance Service; and several physicians, individually. The trial court entered a summary judgment for all defendants. Smith appeals as to all defendants except Suburban Ambulance Service and the individual physicians.
Victor Scott Smith ("Scott"), 17 years old, was a passenger in the front seat of an automobile being driven by his girlfriend, Tammy Graves. They were involved in a two-vehicle accident in Pinson, Alabama. As a result of the accident, both Scott and Ms. Graves were injured. Scott sustained a blunt trauma to his chest and abdomen. Ambulances arrived.
Anthony Whalen, an emergency medical technician for Suburban Ambulance Service, communicated by radio with Carraway Methodist Medical Center ("Carraway") concerning Scott's vital signs. The emergency department at Carraway received the first call from the emergency medical technicians concerning the accident at 2:15 p.m. Because it appeared that Smith was more severely injured than Ms. Graves, Scott and Ms. Graves were transported from the accident site in different ambulances with different destinations. Ms. Graves was transported to Medical Center East ("MCE"), a Level II trauma center. Scott was to be transported to Carraway, a Level I trauma center.
The plaintiff's expert medical witness, Dr. Jonathan Alexander, testified that a Level I trauma center has a larger staff and more medical supplies and personnel than a Level II trauma center. Because of the ability of its staff to diagnose and intervene rapidly, Dr. Alexander said, a Level I trauma center should show a higher survival rate than a Level II trauma center over a large number of patients.
Upon learning that Ms. Graves was being transported to MCE and not Carraway, Scott requested that he also be sent to MCE. The emergency medical technicians advised Scott that, because of the possible severity of his injury, it would be in his best interest to be treated at Carraway. Nevertheless, Scott stated that he wanted to be with Ms. Graves, and he repeated his request to be treated at MCE. The emergency *1327 medical technicians communicated Scott's preference to Dr. R.W. Berry, the emergency physician on call at Carraway. In the Carraway emergency department logbook, it is noted, in Dr. Berry's handwriting, that it should take 10 to 15 minutes for the ambulance to arrive at Carraway. Additionally, "ME" is inscribed on the log book. Dr. Berry stated that he presumed the inscription was a reference to MCE. He could not identify the handwriting. Despite the advice of the emergency technicians, Scott reiterated his request to be transported to MCE. The emergency medical technicians acceded to his request.
The emergency medical technicians notified MCE by radio that they were transporting Scott there, and that he had sustained a blunt trauma to the chest and abdomen. Dr. William Fialkowski, an employee of Southeastern Emergency Physicians, P.A., the emergency care provider for MCE, received Scott at 2:50 p.m. Dr. Fialkowski immediately obtained an X-ray of Scott's chest. The X-ray showed a widening of the superior mediastinum. Dr. Fialkowski believed that Scott had sustained a tear to his aorta, the main blood vessel that supplies blood from the heart to the rest of the body. Scott's appearance, grayish and dusky, and his vital signs blood pressure, heart rate, and pulsewere compatible with Dr. Fialkowski's diagnosis. At 3:00 p.m., Dr. Fialkowski called a Dr. Rollins, a general surgeon known to be at MCE at the time. Dr. Rollins agreed with Dr. Fialkowski's diagnosis. Both further agreed that to treat Scott a thoracic surgeon was needed.
Maxine Walker, the emergency unit secretary, called the hospital operator and obtained the exchange number for Cardio-Thoracic Surgeons, P.C., the group of thoracic surgeons providing emergency care to MCE. The exchange number was that of Answering Birmingham, the answering service for Cardio-Thoracic Surgeons. Ms. Walker called the exchange number and was told that Dr. Austen Bennett was the physician on call. Within 10 or 15 minutes, Dr. Bennett called MCE and informed Ms. Walker that he was not on call but that Dr. John Harlan was on call. Dr. Harlan called Ms. Walker at approximately 3:25 p.m., 10 or 15 minutes after Dr. Bennett had called Ms. Walker. Dr. Fialkowski related Smith's condition to Dr. Harlan, who ordered that an arch aortagram be done. An arch aortagram must be performed by a radiologist. At the time Dr. Harlan issued the order, a radiologist was on call, but he was not at the hospital. The purpose of an aortagram is to ascertain precisely the location of the tear in the aorta so that the tear can be reached quickly during surgery. Ms. Walker called a radiologist, who arrived at the hospital at 3:55 p.m.
At 3:47 p.m., Scott became asystolic, that is, his heart registered no electrical activity. Dr. Fialkowski and the MCE staff attempted cardio-pulmonary resuscitation at that time. An aortagram cannot be performed during cardio-pulmonary resuscitation. Attempts to revive Scott were unsucessful, and, at 4:50 p.m., he was pronounced dead.
Calvin Smith's action, alleging the wrongful death of his son Scott, was pending in the Jefferson Circuit Court on June 11, 1987; therefore, the "scintilla rule" of evidence applies. See Ala.Code 1975, § 12-21-12. The trial court entered a summary judgment for all defendants. The trial court, relying on Sasser v. Connery, 565 So.2d 50 (Ala.1990), held that, the plaintiff had failed to produce a scintilla of evidence that any action or omission of any of the defendants had probably caused Scott Smith's death, and thus that there was no genuine issue of material fact on the element of proximate cause.
Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c), A.R.Civ.P. Lolley v. Howell, 504 So.2d 253 (Ala.1987). All reasonable doubts concerning the existence of a genuine issue of fact must be resolved against the moving party. Lolley v. Howell, supra; Fountain v. Phillips, 404 So.2d 614 (Ala.1981).
Calvin Smith argues that, for separate reasons, each of the defendants proximately *1328 caused his son's death. First, we address his argument concerning Carraway's alleged negligence.
Smith argues that Carraway proximately caused his son's death because Dr. Berry, the emergency physician on call at Carraway at the time of the accident, did not mandate that he be transported to Carraway. In support of his argument, Smith offers the deposition of Dr. Alexander, his expert medical witness. Dr. Alexander testified that he was aware that Scott Smith informed the emergency medical technicians that he wanted to be with Ms. Graves and that he wanted to be treated at MCE. In light of this testimony, Dr. Alexander stated that, given Dr. Berry's knowledge of the serious nature of Scott's injury, Dr. Berry should have instructed the emergency medical technicians on the scene to transport Scott to Carraway, regardless of his request to be taken to MCE.
Carraway argues that established medical procedures mandate that an injured person be transported to the hospital of his choice. Carraway presented the testimony of Dr. Berry, who stated that medical procedures for the transportation of injured persons from the scene of an accident are promulgated by the Birmingham Regional Emergency Medical Services System ("BREMSS"), an agency established by the Alabama Department of Public Health. He said that Carraway was a member of BREMSS at the time of Scott's accident. Dr. Berry further stated that, according to the procedure established by BREMSS, a patient must be transported to the hospital of his choice if that person is able to speak and is capable of making a decision. Dr. Berry's testimony is corroborated by the testimony of both Anthony Whalen and Peggy Hughes, the emergency medical technicians present at the scene of the accident.
Based on the undisputed testimony of Dr. Berry, Anthony Whalen, and Peggy Hughes, we hold that there was no genuine issue of material fact as to whether established medical procedures mandated that Suburban Ambulance transport Scott Smith to the hospital of his choice if he was able to speak and was capable of making a decision. It is also undisputed that Scott was able to speak and that he was capable of making a decision. Therefore, Carraway had no duty to mandate that Suburban Ambulance transport Scott to its emergency room. Accordingly, we hold that Carraway was entitled to a judgment as a matter of law.
The plaintiff argues that the trial court erred in entering judgment for MCE for three reasons: 1) MCE failed to order the ambulance squad to transport a seriously ill patient to Carraway, a Level I trauma center, rather than to MCE; 2) Dr. Fialkowski failed to order that Scott be transferred to Carraway after his initial evaluation of the patient; and 3) the staff at MCE caused a delay in contacting the on-call surgeon at Cardio-Thoracic Surgeons.
The plaintiff also argues that Southeastern Emergency Physicians, the group for whom Dr. Fialkowski provided emergency services to MCE, is liable for Dr. Fialkowski's failure, after initial evaluation, to order Scott transferred to Carraway.
As to Cardio-Thoracic Surgeons, the plaintiff argues that Dr. Harlan, upon learning of Scott Smith's condition, should have ordered that Scott be sent to Carraway, and that his failure to do so proximately caused Scott's death.
MCE, Southeastern Emergency Physicians, and Cardio-Thoracic Surgeons argue, separately, that the trial court correctly entered judgment on their behalf because, they argue, the plaintiff presented no evidence that they proximately caused Scott Smith's death. They argue that Dr. Alexander, the plaintiff's expert medical witness, could not state that their acts or omissions probably caused Scott Smith's death.
"In medical malpractice cases, the plaintiff must prove negligence through the use of expert testimony, unless an understanding of the doctor's alleged lack of due care or skill requires only common knowledge or experience." Monk v. Vesely, 525 So.2d 1364, 1365 (Ala. 1988).
*1329 In Sasser v. Connery, 565 So.2d 50, 51 (Ala.1990), we cited Peden v. Ashmore, 554 So.2d 1010 (Ala.1989), in which we had stated the law concerning the legal sufficiency of evidence on the element of proximate cause in a medical malpractice action:
"The Plaintiff must adduce some evidence that the alleged negligence probably caused the injury or death:
`In a medical malpractice case, in order to find liability there must be more than a mere possibility that the alleged negligence caused the injury. Williams v. Bhoopathi, 474 So.2d 690, 691 (Ala.1985). There must be some evidence that that negligence probably caused the injury. Orange v. Shannon, 284 Ala. 202, 206, 224 So.2d 236, 239 (1969).'
"Howard v. Mitchell, 492 So.2d 1018, 1019 (Ala.1986)."
554 So.2d at 1013 (emphasis in original).
Resolving all reasonable doubts against the defendants, we find that Dr. Alexander's deposition testimony reveals the following:
Scott Smith suffered a torn descending aorta. A torn descending aorta causes blood to pour into the chest cavity. In Scott's case, although 10 pints of blood were transfused into his body, he died from an excessive loss of blood. Eighty per cent of those who suffer from a torn descending aorta as a result of an accident die at the scene of the accident. Approximately 90 to 95% of those who incur a torn descending aorta, whether they are transported from the accident scene or not, die from the injury. To survive, Scott Smith required a surgical procedure known as a thoracotomy. Performing a thoracotomy would have entailed opening Scott's chest, identifying the area of insult to the aorta, crossclamping the aorta, and repairing the tear. The surgery should be performed in "an operating room theatre, with anesthesia assistance, plus many other factors that favor survivability, as opposed to an emergency room." An "emergency thoracotomy" differs from a thoracotomy insofar as no presurgery aortagram, anesthesia, or other surgery support is used. Dr. Alexander stated that he did not "fault [Dr. Fialkowski] for not opening the chest" because "emergency thoracotomy has a close to zero per cent survival rate."
Although Dr. Alexander recommended that a thoracotomy should have been performed on Scott, he could not state that the surgery probably would have saved Scott's life. The defendants quote the following from Dr. Alexander's deposition:
"Q. Whatdo you contend that some surgery would have saved this boy's life?
"A. I contend that surgery performed in a timely fashion may have saved this boy's life, yes, sir.
"Q. May have?
"A. Yes, sir.
"Q. But you can't say that it would have?
"A. I can't tell you that with 100 percent certainty that surgery was going to save his life.
"Q. You can't even state that in all probability it would have, can you?
"A. That is correct."
In Sasser v. Connery, Ollie Powers Sasser died from cancer. Her administrator, John Lee Sasser, sued Dr. Francis Connery in a wrongful death action, alleging that his failure to conduct certain tests on the deceased had resulted in her eventual death from a cancer that could have been effectively treated if those tests had been conducted and the cancer detected earlier. Dr. Connery argued that the plaintiff had failed to produce a scintilla of evidence that he proximately caused Ollie Sasser's death. The trial court denied the defendant's motions for directed verdict, and the jury returned a verdict in his favor. Sasser appealed and Dr. Connery cross-appealed. In his cross-appeal, Dr. Connery argued that the trial court erroneously denied his motions for directed verdict because, he argued, the plaintiff did not present any expert medical testimony that his alleged negligence probably caused Ollie Sasser's death. Reviewing the evidence for a scintilla of evidence tending to prove that Dr.
*1330 Connery's alleged negligence caused injury to Ollie Sasser, the Sasser Court stated:
"Sasser did have experts testify, but none of them testified that Dr. Connery's alleged negligence caused any injury to the deceased. None of the experts could say that if Dr. Connery had conducted the tests in question and had found the cancer, then Ms. Sasser's life would have been saved or even extended. One of the plaintiff's experts, Dr. Goldstein, testified that it was equally probable that an early diagnosis of Ollie's cancer would not have changed the outcome or extended her life; he stated that his testimony was `speculation' and that he could not say whether with the tests she would have lived longer. Another of the plaintiff's experts, Dr. Addison, could not testify as to any medical probability that an earlier diagnosis would have changed the outcome or would have extended Ollie's life. In Peden [v. Ashmore, 554 So.2d 1010 (Ala.1989)], the experts also testified that their testimony was `speculation' and that while they disagreed with the defendant's treatment, they could not say that it made a difference one way or the other. Here, Sasser did not produce a scintilla of evidence that Dr. Connery's alleged negligence probably caused Ollie's death or probably caused her life to be shortened. Without this scintilla of evidence that Dr. Connery probably caused Ollie's death or that earlier diagnosis probably would have extended her life, Sasser failed to meet the burden of proof, and the case was improperly submitted to the jury."
565 So.2d at 51 (emphasis in original).
In this case, Dr. Alexander testified that, while he disagreed with Dr. Fialkowski's treatment of Scott Smith and that he believed the defendants caused some delay in treating Scott, he could not say that a thoracotomy would have probably saved his life. Therefore, Calvin Smith did not produce a scintilla of evidence that the defendants' alleged negligence probably caused Scott Smith's death. Therefore, because the plaintiff clearly failed to rebut the prima facie showing of a lack of probable cause, there is no genuine issue of material fact and the defendants are entitled to a judgment as a matter of law.[1] Rule 56(c), A.R.Civ.P.
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
HORNSBY, C.J., and MADDOX and INGRAM, JJ., concur.
HOUSTON, J., concurs specially.
HOUSTON, Justice (concurring specially).
I find no initial legal liability on the part of any defendant for any act that proximately caused the tragic death of young Victor Scott Smith, even using the most liberal standard for testing the sufficiency of the evidencethe scintilla rule. In Bradford v. McGee, 534 So.2d 1076, 1079-80 (Ala.1988), this Court held:
"To present a jury question, the plaintiff must adduce some evidence indicating that the alleged negligence (the breach of the appropriate standard of care) probably caused the injury. A mere possibility is insufficient. The evidence produced by the plaintiff must have `selective application' to one theory of causation. Howard [v. Mitchell, 492 So.2d 1018 (Ala.1986) ]; Williams v. Bhoopathi, 474 So.2d 690 (Ala.1985).
"`What was said in McClinton v. McClinton, 258 Ala. 542, 544-45, 63 So.2d 594, 597 (1952), is appropriate in this case:
"`"Proof which goes no further than to show an injury could have occurred in an alleged way, does not warrant the conclusion that it did so occur, where from the same proof the injury can with equal probability be attributed to some other cause."
"`But a nice discrimination must be exercised in the application of this principle.

*1331 As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deductible from them as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only.' [Emphasis added (in Bradford v. McGee) ].

"`(Quoting Southern Ry. Co. v. Dickson, 211 Ala. 481, 486, 100 So. 665, 669 (1924). See, e.g., McKinnon v. Polk, 219 Ala. 167, 168, 121 So. 539, 540 (1929) (a case involving a suit for personal injuries allegedly caused by the negligence of the plaintiff's physician)).'
"Howard at 1020."
NOTES
[1] The reasoning employed in this portion of our opinion applies equally to Carraway; however, Carraway did not raise this argument on appeal.