611 So.2d 358 (1992)
Kenneth W. WILLARD, as the administrator of the Estate of Marjorie D. Willard, deceased,
v.
Dr. Brian A. PERRY; Brian A. Perry, M.D., P.C.
No. 1910963.
Supreme Court of Alabama.
December 11, 1992.
S. Shay Samples and Richard D. Stratton of Hogan, Smith, Alspaugh, Samples & Pratt, P.C., Birmingham, for appellant.
Walter W. Bates of Starnes & Atchison, Birmingham, for appellees.
PER CURIAM.
In this wrongful death case the trial court entered a summary judgment for the defendant doctor and his professional corporation, based on a conclusion that, as a matter of law, the plaintiff's decedent had not died as a proximate result of any negligence on the part of the doctor. The plaintiff appeals. We reverse and remand.
Marjorie Willard went to Dr. Brian Perry's office on Saturday morning, February 11, 1989. At that time, she was complaining of flu-like symptoms (aching, sweats, chills, nausea, vomiting, and dizziness). Dr. Perry's diagnosis was strep throat and probable early dehydration, and his treatment included an injection of LA Bicillin and a prescription for penicillin. Before this treatment was administered to her, Mrs. Willard had told Dr. Perry that she had no known drug allergies. Dr. Perry noted on her chart that she had indicated that she had no known allergies to the drugs. She had taken penicillin in the past and had never exhibited any reaction to it. Shortly after being given the injection, *359 Mrs. Willard vomited and became unconscious. She regained consciousness shortly thereafter, and she was sent home after a period of observation and examination by Dr. Perry or his staff.
Mrs. Willard's husband came home from a meeting, to spend Saturday afternoon with her, because she was not feeling well. She continued to feel ill and reclined on the couch most of the afternoon. She drank orange juice and Gatorade (a soft drink), but continued to be nauseated, and she experienced what is commonly referred to as "the dry heaves." Her condition did not improve, and she had not been able to urinate since the morning. There was evidence that she began to feel worse than she had felt earlier in the day.
Dr. Perry was telephoned at home that night. There is no dispute that a call was made; there is a conflict concerning who did, in fact, make the call to Dr. Perry. Mr. Willard contends that he talked to Dr. Perry and relayed to him the information about his wife's condition set out above. Dr. Perry testified that he spoke to Mrs. Willard. There is further conflict in the evidence in that Dr. Perry testified that he recommended admission to the hospital at that time because of Mrs. Willard's condition and her lack of improvement since that morning, when he had last seen her. On the other hand, Mr. Willard testified that he suggested to Dr. Perry that Mrs. Willard needed to go to the hospital, but that Dr. Perry assured him that it would take time for the medicine to take effect, and, if she was not better in the morning, then he should bring her to the emergency room at Baptist Medical Center-Cherokee ("BMC-Cherokee").
Regardless of any conflict concerning the details of the telephone conversation, the record indicates that there is no dispute that the following occurred after the conversation. First, Dr. Perry called the hospital and gave admission orders to a Nurse McCord. Second, Nurse McCord recorded the admission orders on Mrs. Willard's chart and dated them February 11, 1989. Dr. Perry did not learn until the following morning that Mrs. Willard had failed to go to the hospital that evening. Mr. Willard contended that there was no instruction by Dr. Perry to go to the hospital, but he acknowledged that he would have taken his wife to the hospital if he thought she needed to goregardless of what Dr. Perry told them.
After the telephone call, Mrs. Willard showered. According to her husband, she felt better after the shower and ate the broth of a bowl of chicken soup. She was able to keep the soup down without vomiting. When she went to bed on the evening of February 11, there was nothing about her condition, in her husband's opinion, that warranted her being at the hospital. During the course of the evening, while Mrs. Willard slept, Mr. Willard watched her to determine if her condition worsened. At no time did her condition worsen to the point that he felt she needed to go to the hospital.
Mrs. Willard was essentially the same early Sunday morning. Mrs. Willard's sister had planned to take her to Rome, Georgia, to be seen by Dr. Buford Harbin.
Later on Sunday morning Mrs. Willard's condition worsened. She began to have difficulty breathing and was admitted in respiratory distress to BMC-Cherokee. Nurses at the hospital called Dr. Perry to the hospital, and he instituted intensive treatment.
Mrs. Willard was subsequently transferred by ambulance to Floyd Medical Center in Rome, Georgia, where she was attended by Dr. Buford Harbin. Despite intensive and vigorous efforts at Floyd Medical Center, Mrs. Willard died on February 13, 1989, at 33 years of age.
Dr. Harbin listed her cause of death as an anaphylactoid reaction to penicillin. This reaction is a shock-causing allergic or hypersensitive reaction to a drug. Dr. Perry testified that the cause of death was probably sepsis. The plaintiff's expert, Dr. Schwartz, testified that death could have been caused by either septic shock or a delayed anaphylactic reaction.
Kenneth W. Willard, as administrator of the estate of his deceased wife, Marjorie D. Willard, filed a wrongful death action *360 against Dr. Brian A. Perry, and Dr. Brian A. Perry, M.D., P.C. In his complaint, Mr. Willard alleged that Dr. Perry failed to assess Mrs. Willard before administering LA Bicillin and failed to take a complete history; that he failed to assess Mrs. Willard promptly and properly after administration of LA Bicillin, and that he failed to hospitalize and institute appropriate treatment to Mrs. Willard for her anaphylactic reaction to LA Bicillin. The trial court entered a summary judgment for both Dr. Perry and his professional corporation, holding, as a matter of law, that the plaintiff had offered no substantial evidence that the death of Marjorie Willard was proximately caused by the negligence of Dr. Perry.
Rule 56, A.R.Civ.P., sets forth a two-tiered standard for entering a summary judgment. The rule requires the trial court to determine (1) that there is no genuine issue of material fact, and (2) that the moving party is entitled to a judgment as a matter of law. The burdens placed on the moving party by this rule have often been discussed by this Court:
"`The burden is on one moving for summary judgment to demonstrate that no genuine issue of material fact is left for consideration by the jury. The burden does not shift to the opposing party to establish a genuine issue of material fact until the moving party has made a prima facie showing that there is no such issue of material fact. Woodham v. Nationwide Life Ins. Co., 349 So.2d 1110 (Ala.1977); Shades Ridge Holding Co. v. Cobbs, Allen & Hall Mortg. Co., 390 So.2d 601 (Ala.1980); Fulton v. Advertiser Co., 388 So.2d 533 (Ala.1980).'"
Berner v. Caldwell, 543 So.2d 686, 688 (Ala.1989) (quoting Schoen v. Gulledge, 481 So.2d 1094 (Ala.1985)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and resolve all reasonable doubts against the movant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986); Harrell v. Reynolds Metals Co., 495 So.2d 1381 (Ala.1986).
This medical malpractice case arises out of care and treatment provided on February 11-12, 1989. Accordingly, this case is governed by the Medical Liability Act of 1987. Ala.Code 1975, § 6-5-540 et seq. Section 6-5-549 mandates that the standard of proof the nonmoving party must meet to overcome a properly supported motion for summary judgment is "substantial evidence." Under the substantial evidence test codified at § 6-5-542, the nonmovant must present "that character of admissible evidence which would convince an unprejudiced thinking mind of the truth of the fact to which the evidence is directed."
"In medical malpractice cases, the plaintiff must prove negligence through the use of expert testimony, unless an understanding of the doctor's alleged lack of due care or skill requires only common knowledge or experience." Monk v. Vesely, 525 So.2d 1364, 1365 (Ala.1988). In cases where expert testimony is required, the plaintiff must establish through such testimony (1) that the defendant breached the standard of care and (2) that the breach proximately caused the injuries complained of. Dobbs v. Smith, 514 So.2d 871 (Ala. 1987); Howard v. Mitchell, 492 So.2d 1018 (Ala.1986); Lightsey v. Bessemer Clinic, P.A., 495 So.2d 35 (Ala.1986).
In Peden v. Ashmore, 554 So.2d 1010 (Ala.1989), we stated the rule concerning the legal sufficiency of evidence on the element of proximate cause in a medical malpractice action:
"The plaintiff must adduce some evidence that the alleged negligence probably caused the injury or death:
"`In a medical malpractice case, in order to find liability there must be more than a mere possibility that the alleged negligence caused the injury. Williams v. Bhoopathi, 474 So.2d 690, 691 (Ala.1985). There must be some evidence that that negligence probably caused the injury. Orange v. Shannon, 284 Ala. 202, 206, 224 So.2d 236, 239 (1969).'
"Howard v. Mitchell, 492 So.2d 1018, 1019 (Ala.1986)." 554 So.2d at 1013 (emphasis in original).
*361 We have carefully examined the record in this case and we conclude that the testimony of the medical experts was sufficient evidence to warrant submitting to the jury the issues whether Dr. Perry breached the standard of care and, if so, whether his breach was the proximate cause of Mrs. Willard's death. Murdoch v. Thomas, 404 So.2d 580 (Ala.1981); Waddell v. Jordan, 293 Ala. 256, 302 So.2d 74 (1974); Pappa v. Bonner, 268 Ala. 185, 105 So.2d 87 (1958). The judgment of the trial court is reversed and the cause is remanded for a trial on the merits.
REVERSED AND REMANDED.
HORNSBY, C.J., and SHORES, ADAMS, KENNEDY and INGRAM, JJ., concur.
MADDOX and STEAGALL, JJ., dissent.
MADDOX, Justice (dissenting).
The majority holds that "the testimony of the medical experts was sufficient evidence to warrant submitting to the jury the issues whether Dr. Perry breached the standard of care and, if so, whether his breach was the proximate cause of Mrs. Willard's death." 611 So.2d at 361.
If we were reviewing the judgment of the trial court under Alabama's old "scintilla rule," I would agree that the evidence presented did preclude the entry of a summary judgment. This case, however, being a medical malpractice case, is controlled by the provisions of the Medical Liability Act of 1987. Ala.Code 1975, § 6-5-540 et seq. Section 6-5-549 mandates that the standard of proof the nonmoving party must meet to overcome a properly supported motion for summary judgment is "substantial evidence." Under the substantial evidence test codified at § 6-5-542, the nonmovant must present "that character of admissible evidence which would convince an unprejudiced thinking mind of the truth of the fact to which the evidence is directed."
"In medical malpractice cases, the plaintiff must prove negligence through the use of expert testimony, unless an understanding of the doctor's alleged lack of due care or skill requires only common knowledge or experience." Monk v. Vesely, 525 So.2d 1364, 1365 (Ala.1988). Because of the complexities of the alleged negligence, this case is one in which expert testimony is required. In cases where expert testimony is required, the plaintiff must establish through such testimony (1) that the defendant breached the standard of care and (2) that this breach proximately caused the injuries complained of. Dobbs v. Smith, 514 So.2d 871 (Ala.1987); Howard v. Mitchell, 492 So.2d 1018 (Ala.1986); Lightsey v. Bessemer Clinic, P.A., 495 So.2d 35 (Ala. 1986).
In Peden v. Ashmore, 554 So.2d 1010 (Ala.1989), we stated the law concerning the legal sufficiency of evidence on the element of proximate cause in a medical malpractice action:
"The plaintiff must adduce some evidence that the alleged negligence probably caused the injury or death:
"`In a medical malpractice case, in order to find liability there must be more than a mere possibility that the alleged negligence caused the injury. Williams v. Bhoopathi, 474 So.2d 690, 691 (Ala.1985). There must be some evidence that the negligence probably caused the injury. Orange v. Shannon, 284 Ala. 202, 206, 224 So.2d 236, 239 (1969).'

"Howard v. Mitchell, 492 So.2d 1018, 1019 (Ala.1986)."
554 So.2d at 1013 (emphasis in original).
I believe that the trial court's judgment should be affirmed, because I find that the plaintiff did not present substantial evidence by a medical expert that the doctor's alleged negligence probably caused the decedent's injuries and death.
The majority has set out many of the basic facts surrounding the treatment of Mrs. Willard by Dr. Perry; therefore, there is no need for me to repeat them. In fact, I do not disagree with the majority's conclusion that there is evidence that Mrs. Willard died as a result of septic shock or a delayed anaphylactic reaction.[1]
*362 The question presented, as I view it, is not whether there is "sufficient evidence" that Mrs. Willard died as a result of the septic shock or a delayed anaphylactic reaction, but whether there is "substantial evidence" presented by medical experts that her death was caused by Dr. Perry's alleged medical malpractice. There is no question that a factfinder could conclude that Mrs. Willard died because she had a reaction to the LA Bicillin administered to her by Dr. Perry or his agent, but there is a serious question whether the plaintiff presented substantial evidence by a medical expert that her death was caused by something Dr. Perry did or failed to do in treating her.
I think it is important to remember what those alleged acts of negligence were. In his complaint, Kenneth W. Willard, as administrator of Mrs. Willard's estate, alleged that Dr. Perry failed to assess Mrs. Willard before administering of LA Bicillin and failed to take a complete history; that he failed to assess Mrs. Willard promptly and properly after administering LA Bicillin, and that he failed to hospitalize Mrs. Willard and institute appropriate treatment for her anaphylactic reaction to LA Bicillin.
The majority says that it has "carefully examined the record in this case," and concludes "that the testimony of the medical experts was sufficient evidence to warrant submitting to the jury the issues whether Dr. Perry breached the standard of care and, if so, whether this breach was the proximate cause of Mrs. Willard's death." The majority does not set out any of this testimony of the experts that it finds presents a jury question. My examination of the record leads me inextricably to the conclusion that the trial judge, David A. Rains, did not err in entering the summary judgment here.
Admittedly, the plaintiff Willard did have experts testify, but none of them testified that Dr. Perry's alleged negligence caused any injury to the deceased. None of the experts could say that if Dr. Perry had reacted in a different fashion, then Mrs. Willard's life would have been saved or extended. In response to direct questioning by the attorney that retained him, the plaintiff's expert, Dr. Schwartz, testified as follows:
"Q. Assume Dr. Schwartz, that Mrs. Willard had been admitted to the hospital that night and that at the time she was not having respiratory difficulty, she was not having any trouble breathing at that point in time. Assume that the orders that appear in the chart of 2/11/89 were followed by the nurses. Assume that the nurses properly and adequately observed and monitored Mrs. Willard's condition. And assume further that they notified Dr. Perry or some other doctor of any significant or substantial changes in Mrs. Willard's physical condition during the course of that night and that Dr. Perry of another doctor responded in a timely and appropriate fashion relative to any substantial or significant changes in her condition. Take that as being true, assume that is true, do you have any opinion as to whether or not based on reasonable medical probability, meaning more likely than not, Mrs. Willard would have survived if she had been in that setting under the facts and circumstances I have given you?
"A. I can only say that it is possible that she might have."
(R. at 591-92; emphasis added.)
The plaintiff's counsel asked alternatively:
"Q. If she is in a hospital environment being properly and adequately monitored and observed by the nurses and ... they respond in a timely and appropriate fashion to any change in her condition and appropriate treatment is undertaken, I will ask you whether or not the likelihood of death from a delayed hypersensitivity reaction would be materially lessened?

*363 "A. I can only say possibly."

(R. at 592-93; emphasis added.)
Dr. Schwartz also expressed uncertainty on the mechanism that led to the Mrs. Willard's death. On this issue, he testified:
"Q. Do you have any opinions as to the cause of death in this case or are you unable to give them because you haven't had the questions answered?
"A. Yes, I would say that would be correct. I think that I don't know what the cause of death was.
"....
"Q. If one assumes that upon receipt of the bicillin on February 11th that she fainted but was aroused easily and that she was observed and had no difficulty breathing and that during the balance of the day she had no difficulty breathing and did not have hypotension or shock on February 11th and at no time did she have an cutaneous reaction, would it be your opinion that the cause of death in this case was something other than an anaphylactic reaction?
"A. I think that is a difficult question to answer because she did not die of acute anaphylactic reaction. I believe that to be true. I think that whether or not she died of a delayed anaphylactic reaction is difficult to ascertain.
"Q. Does that go back to your testimony earlier that you don't know or have an opinion as to what caused the respiratory distress?
"A. Correct."
(R. at 551-53.)
The plaintiff also presented causation testimony from treating physician Dr. Buford Harbin. In response to a question in which he was asked whether the chances of Mrs. Willard's survival relative to the development of an anaphylactoid shock reaction to penicillin would be markedly improved had she been admitted to a hospital setting, he testified as follows:
"A. I think thatthat that is answered by something that we have already gone over. The fact that if you treat somebody earlier in shock, and the situation you described isa patient is not as severe as when Margie [Mrs. Willard] presented the next morning, which I presume is your intention.
"Q. Yes, sir.
"A. I think that statistically speaking the chances of survival would be greater. As I may have said already, she received very intensive treatment and never at any time showed any significant response to that treatment, which was a very disheartening situation for us, as it was for Dr. Perry prior to her coming over here.
"And given theI guess what I am trying to say is, given the profoundness of her lack of response when she did receive treatment, I don'tI can't say whether if she had been treated any earlier she wouldit would have made any difference.
"But, as a general rule, the earlier you can treat shock, presumably the better the outcome. And you are looking at many cases.
"....
"Q. Dr. Harbin, as I understand what you are saying, while statistically with any disease, earlier treatment can mean better outcome. In this particular case, you cannot say that earlier treatment would have changed this patient's outcome; is that fair?
"A. I don'tI don't know how you could answer that question."
(R. at 440-41, 447-48; emphasis added.)
This Court has frequently and recently addressed the burden of a plaintiff in a medical malpractice case to prove the necessary element of causation. In Smith v. Medical Center East, 585 So.2d 1325 (Ala. 1991), a case in which the "scintilla rule" rather than the "substantial evidence" rule was applicable, the alleged negligence of the defendant was failing to perform a timely emergency thoracotomy on the decedent who had suffered blunt trauma to his chest and abdomen. The defendants were granted summary judgment based on the plaintiff's failure to present sufficient evidence of causation. The plaintiff's expert in Smith had given the following deposition testimony:

*364 "Q. Whatdo you contend that some surgery would have saved this boy's life?
"A. I contend that surgery performed in a timely fashion may have saved this boy's life, yes, sir.
"Q. May have?
"A. Yes, sir.
"Q. But you can't say that it would have?
"A. I can't tell you that with 100 percent certainty that surgery was going to save his life.
"Q. You can't even state that in all probability it would have, can you?
"A. That is correct."
585 So.2d at 1329.
In the Smith case, the plaintiff's expert, while he disagreed with the defendants' treatment of the patient and believed that the defendants caused some delay in treating the patient, could not say that a thoracotomy would have probably saved his life. This Court held that the plaintiff had not produced "a scintilla of evidence that the defendants' alleged negligence probably caused [the patient's] death." Id. at 1330. Based on this finding, the Court affirmed the summary judgment.
In Sasser v. Connery, 565 So.2d 50 (Ala. 1990), the alleged negligence of the defendant doctor was a failure to diagnose cancer. Sasser, like Smith, was decided under the scintilla rule. The plaintiff, as administrator of a decedent's estate, filed a wrongful death action, alleging that the defendant's failure to conduct certain tests on a patient had resulted in her eventual death from cancer, a cancer that the plaintiff alleged could have been effectively treated if those tests had been conducted and the cancer detected earlier. The jury returned a verdict for the defendant; the plaintiff appealed from the judgment entered on that verdict. The defendant cross-appealed, arguing that he had been entitled to a directed verdict based on the plaintiff's failure to present any expert medical testimony that the defendant's alleged negligence proximately caused the death.
As in this case, the plaintiff's experts in Sasser could not testify that the defendant's alleged negligence caused any injury to the patient. "None of the experts could say that if the defendant had conducted the tests in question and had found the cancer, then [the patient's] life would have been saved or even extended." 565 So.2d at 51. While one of the experts testified that it was equally probable that an early diagnosis would not have changed the outcome, he stated that his testimony was "speculation" and that he could not say whether with the tests the patient would have lived longer. Id. Based on the lack of causation testimony, this Court held that the plaintiff had failed to meet the burden of proof and that the case had been improperly submitted to the jury.
In Peden v. Ashmore, 554 So.2d 1010 (Ala.1989), a wrongful death medical malpractice case decided under the scintilla rule, the plaintiff alleged that the doctor's delay in diagnosing and recommending treatment of a cerebral hemorrhage proximately caused the patient's death. The court directed a verdict for the defendant doctor, and the plaintiff appealed. On the issue of causation, the plaintiff's expert testified as follows:
"A. It would be speculation at this point to say what the outcome would have been, but it is fair to say she would have had a far better chance to survive or live a normal life or live with a stroke, or she could have still died, but the fact that she did not get the treatment or care for so many hours made the possibility of brain damage and death and the negative parts of the speculation more strong.
"....
"A. Life and death are never guaranteed in any medical specialty, unfortunately. But based upon literature, deductions are made as to what is appropriate care and what is a percentage mortality. I would say that her mortality and her morbidity statistics would have shifted in her favor if she got the care I recommended. That doesn't mean she would have been a normal person back in Dr. Ashmore's office. She could have still died, she might have had a stroke; it *365 is all speculative and I cannot get into that."
554 So.2d at 1013-14.
The Court affirmed the judgment based on the directed verdict for the defendant because "the plaintiff did not present a scintilla of evidence that there was negligence by Dr. Ashmore that proximately caused the death of Mrs. Aderholt." Id. at 1014.
The majority cites the Peden case for the proposition that a plaintiff must adduce sufficient evidence that the alleged negligence of a defendant doctor probably caused the injury or death, and then concludes that the plaintiff, in this case, met his burden. I cannot come to that conclusion. I agree with the trial judge. My reading of the record, and of the specific testimony of the plaintiff's experts, convinces me, as it did the trial judge, that the plaintiff here, like the plaintiffs in Smith, Sasser, and Peden, did not meet his burden of proof.
It must be remembered that the plaintiff here alleged that Dr. Perry failed to assess Mrs. Willard prior to administering LA Bicillin and failed to take a complete history; that he failed to assess Mrs. Willard promptly and properly after administering LA Bicillin, and that he failed to hospitalize and institute appropriate treatment to Mrs. Willard for her anaphylactic reaction to LA Bicillin. I frankly fail to find in this record substantial evidence by medical experts that any act or omission on Dr. Perry's part, as alleged, probably caused Mrs. Willard's death. In fact, the testimony of the plaintiff's experts that I have set out shows exactly the contrary. Dr. Schwartz would only say that her death "possibly" could have been avoided. Dr. Harbin, who was her treating physician when she died, was asked whether "earlier treatment would have changed this patient's outcome"; he said: "I don'tI don't know how you could answer that question." (R.T. ___.)
If the medical experts cannot testify that Mrs. Willard's death was probably caused by the negligence of Dr. Perry, then I cannot see how a jury of laypersons can reach this conclusion. I think that our previous cases have held that the plaintiff must produce medical evidence that the alleged negligence probably caused the injury or death, and that is true whether the quantum of proof was under the prior "scintilla rule" or under the newer "substantial evidence rule." The question is whether there is expert medical testimony showing the probability of causation rather than whether that probability is shown by a mere scintilla of evidence or by substantial evidence.
Based on the foregoing, I must respectfully disagree with the majority.
STEAGALL, J., concurs.
NOTES
[1] Dr. Harbin listed the cause of death as an anaphylactoid reaction to penicillin. This reaction is an allergic or hypersensitive reaction to the drug that causes shock. Dr. Perry testified that the cause of death was probably sepsis. The plaintiff's retained expert, Dr. Schwartz, testified that death could have been caused by either septic shock or a delayed anaphylactic reaction.